# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>SOTERA WIRELESS, INC.,<br><br>Debtor.<br><br>MASIMO CORPORATION,<br>Appellant,<br><br>v.<br><br>SOTERA WIRELESS, INC.,<br>Appellee. | Case No.: 17-cv-0885-BTM-BLM<br><br>**ORDER AFFIRMING JUDGMENT OF THE BANKRUPTCY COURT** |

Masimo Corporation ("Masimo") appeals under 28 U.S.C. § 158(a)(1) from a July 18, 2017 memorandum of decision and order of the United States Bankruptcy Court for the Southern District of California, adjudicating Masimo's claims against Sotera Wireless, Inc. ("Sotera") under the California Uniform Trade Secret Act ("CUTSA"). For the reasons discussed below, the Court AFFIRMS.

//
//
//

## I. BACKGROUND

On May 10, 2013, Masimo filed a lawsuit in Orange County Superior Court against Sotera for, among other causes of action, trade secret misappropriation under CUTSA. (ER 77). Masimo alleged that two of its former employees, James Welch and David Hunt, took trade secrets from Masimo and that Sotera then used those trade secrets. *Id.* On September 30, 2016, before the state court trial had commenced, Sotera filed for Chapter 11 bankruptcy. (ER 78). As part of the bankruptcy proceedings, Masimo filed a formal proof of claim asserting at least $15,500,000 in damages, which was in part, based on misappropriation of trade secrets. (ER 84). Sotera filed an objection to the claim. *Id.*

On April 14, 2017, the Bankruptcy Court announced its determinations on Masimo's claim and Sotera's objection through an oral ruling. (ER 2533). On July 18, 2017, to supplement the oral ruling, the Bankruptcy Court issued a 117 page memorandum of decision that included post-trial findings of fact and conclusions of law. (ER 75). The Bankruptcy Court overruled Sotera's objection, in part, but otherwise sustained Sotera's objection to Masimo's claim, finding that Masimo was entitled to a claim of $558,000. (ER 191). The Bankruptcy Court awarded Masimo $240,000 for Sotera's misappropriation of Masimo's pricing trade secrets, $300,000 for David Hunt's misappropriation of Masimo's customer trade secrets[1], and $18,000 to recover direct costs for Masimo's forensic investigation of Sotera's acts. (ER 186, 189-90). The Bankruptcy Court also granted Masimo's request for injunctive relief, requiring Sotera to remove and destroy Masimo's technical trade secret documents from its computers and barring use of those trade secrets. (ER 129, 191).

//

---

[1] The Bankruptcy Court found Sotera liable for Hunt's misappropriation through the doctrine of respondeat superior.

Masimo has appealed the Bankruptcy Court's order, arguing that: (1) the Bankruptcy Court legally erred in its analysis of CUTSA's requirements for trade secret misappropriation, (2) the Bankruptcy Court made clearly erroneous findings of fact that certain information was either not a trade secret or not used by Sotera, and (3) the Bankruptcy Court failed to address Masimo's request for royalties for Sotera's supposedly adjudged misappropriation of thousands of Masimo documents. (Appellant Brief at 1).

## II. STANDARD OF REVIEW

"The bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error." *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 887 (9th Cir. 2010). Under the "clear error" standard, the reviewing court will reverse a lower court's "findings of fact only upon a definite and firm conviction that a mistake has been made." *Sepulveda v. Pac. Mar. Ass'n*, 878 F.2d 1137, 1139 (9th Cir. 1989). The standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). "If the [lower] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. 564 at 573-74. "The issue of whether information constitutes a trade secret is a question of fact." *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003).

## III. DISCUSSION

### A. The Bankruptcy Court's Consideration Of Whether Information Was "Readily Ascertainable"

For its first issue on appeal, Masimo argues that the Bankruptcy Court, in determining whether information qualified as a trade secret, erroneously included the requirement that the information not be "readily ascertainable." (Appellant Brief

at 32). The Court reviews this under a de novo standard.

Masimo focuses on the Bankruptcy Court's statement that "readily ascertainable information cannot be a trade secret." (ER 92). The Bankruptcy Court cited *Syngenta Crop Prot., Inc. v. Helliker*, 138 Cal. App. 4th 1135, 1172 (2006), which explains that "[i]nformation that is readily ascertainable by a business competitor derives no independent value from not being generally known." *Syngenta*, in turn, cited to *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1326 (1986). CUTSA defines "trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ.Code Section 3426.1. By considering whether information was "readily ascertainable" in interpreting "derives independent economic value . . . from not being generally known," an express phrase within CUTSA's definition of a trade secret, *Syngenta* arguably incorporated "readily ascertainable" into the definition of a trade secret. *See Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 62 (2014) ("the focus of the inquiry regarding the independent economic value element is on whether the information is generally known to or readily ascertainable by business competitors or others to whom the information would have some economic value").

Masimo's assertion that the Bankruptcy Court committed legal error relies on *Abba Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21 (1991), which stated that "under California law, information can be a trade secret even though it is readily ascertainable, so long as it has not yet been ascertained by others in the industry. Accordingly, [the court] decline[d] to follow [*American Paper & Packaging Prod., Inc. v. Kirgan*, 183 Cal. App. 3d 1318 (1986)], to the extent that it suggest[ed] that

4

information is not protectable as a trade secret if it is known or readily ascertainable." *Abba*, *Syngenta*, and *American Paper* are all California Court of Appeal opinions. To the extent there is a disagreement among the California Courts of Appeal on this issue, the Supreme Court of California has not yet weighed in. Therefore, *Abba* is persuasive and not binding authority. *See Sarti v. Salt Creek Ltd.*, 167 Cal. App. 4th 1187, 1193 (2008) ("there is no horizontal stare decisis in the California Court of Appeal"); *Auto Equity Sales, Inc. v. Superior Court of Santa Clara Cty.*, 57 Cal. 2d 450, 456 (1962) ("where there is more than one appellate court decision, and such appellate decisions are in conflict . . . the court exercising inferior jurisdiction can and must make a choice between the conflicting decisions"). The Court agrees with the Bankruptcy Court and does not find that it legally erred in relying on *Syngenta*, which in turn relied on *American Paper*, in interpreting the definition of "trade secret" under CUTSA.[2]

However, even assuming that the Bankruptcy Court legally erred in stating that "readily ascertainable information cannot be a trade secret," this error was not material to the Bankruptcy Court's analysis and therefore, would not be sufficient grounds for reversal. "[T]he assertion that a matter is readily ascertainable by proper means remains available as a defense to a claim of misappropriation." *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 899 (2003). Therefore, regardless of whether it was at the trade secret definition stage or the misappropriation stage, the Bankruptcy Court's affirmative finding that information was "readily ascertainable" would have prevented a finding of a CUTSA violation. Assuming that "readily ascertainable" can only be a defense to misappropriation, the Bankruptcy Court would only have committed reversible legal error if it had

---

[2] The Court acknowledges that several federal district courts have cited *Abba* for the proposition that "information can be a trade secret even though it is readily ascertainable, so long as it has not yet been ascertained by others in the industry." *See, e.g.*, *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1193 (S.D. Cal. 2012). While this lends support for a court to follow *Abba*, it is not a dispositive reason to find that a court legally erred in its valid choice between conflicting opinions with equally persuasive authority.

misallocated the burden of proof between the parties, specifically, if it found that information was not a trade secret because Masimo failed to demonstrate that the information was not readily ascertainable. Masimo points to only one instance of this occurring. (Appellant Brief at 34). In discussing whether Sotera used Masimo trade secrets to target a particular customer, the Bankruptcy Court stated that "Masimo failed to establish that the information was not readily ascertainable." (ER 173 ¶ 422). However, this was not material to the Bankruptcy Court's conclusion that there was no misappropriation because Sotera independently derived the idea to target a particular customer, without using Masimo's information. Further, this one instance is unrelated to any of the four alleged trade secrets at issue in this appeal.

The Court finds that the Bankruptcy Court did not commit legal error in its analysis of "readily ascertainable." To the extent that there was an error, it did not manifest in a manner sufficient to create grounds for reversal.

### B. The Bankruptcy Court's Determination Of What Constituted "Use" Of A Trade Secret

For its second issue on appeal, Masimo argues that the Bankruptcy Court legally erred in its analysis of "use" under CUTSA. Specifically, Masimo contends that the Bankruptcy Court erred in (1) not including "passive consideration of data" in its definition of "use," and (2) allowing a finding of "independent derivation" to defeat a finding of "use." (Appellant Brief at 36, 38). The Court reviews this under a de novo standard.

First, the Bankruptcy Court never stated that "passive consideration of data" cannot be "use" under CUTSA. The Bankruptcy Court did not explicitly define the term, nor did it need to, as CUTSA "does not define the term 'use'" and "the meaning of the term may vary depending on the context." *See Syngenta*, 138 Cal. App. 4th at 1172.

Masimo relies on *Syngenta,* where plaintiff, a pesticide manufacturer,

brought an action against the state Department of Pesticide Regulation, in part, for misappropriation of its trade secrets under the Uniform Trade Secrets Act.[3] *Syngenta*, 138 Cal. App. 4th at 1145. To receive certificates of registration from the Department, plaintiff submitted data concerning the health and environmental impacts of specific active ingredients in its pesticides. *Id.* When subsequent pesticide manufacturers applied for registration certificates for pesticides that contained those same specific active ingredients, the department, without actually reviewing the previously submitted data from plaintiff, nonetheless took into account "its prior evaluation of [plaintiff's] data in evaluating the later applications." *Id.* The *Syngenta* court held that

> for purposes of pesticide regulation in California, the Department [of Pesticide Regulation] "uses" data when it "considers" the data within the meaning of Food and Agricultural Code section 12811.5. By taking into account its prior evaluation of an active ingredient based on data submitted by another applicant, the Department relieves a current applicant of the expense of producing or otherwise acquiring similar data and "uses" the data to the benefit of the current applicant. . . . Accordingly, the superior court's ruling that the Department's "passive consideration" of data cannot be misappropriation under the act was error.

*Id.* at 1172–73.

The Court is not persuaded by Masimo's attempt to stretch *Syngenta*'s context-specific finding that the Department of Pesticide Regulation's "passive consideration" of data it had previously analyzed and relied upon was "use," into a broad rule that "passive consideration," under a more generic meaning, is always "use." The Bankruptcy Court did not legally err by not applying a dubious rule derived from an overbroad reading of *Syngenta*.

---

[3] "California has adopted the Uniform Trade Secrets Act ('UTSA') which codifies the basic principles of common law trade secret protection." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993).

| | |
|---|---|
| 1 | Second, the Bankruptcy Court did not legally err in allowing a finding of "independent derivation" to preclude a finding of improper "use." A "prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003). CUTSA provides that "[r]everse engineering or independent derivation alone shall not be considered improper means." Cal. Civ. Code § 3426.1. Therefore, "[e]vidence of independent derivation or reverse engineering directly refutes the element of use through improper means." *Sargent*, 110 Cal. App. 4th at 1670. "Proof that defendant's use resulted from independent derivation or reverse engineering is evidence that there was no improper use on its part. The defendant does not have a burden of proof to make that showing." *Id.* at 1669. |

Masimo takes issue with the Bankruptcy Court's conclusion that there was no improper use of Masimo's purported trade secrets if it determined that Sotera had independently derived the same information. (Appellant Brief at 39). The Bankruptcy Court's conclusion was consistent with the correct standard. (*See* ER 93-94). If a necessary element of misappropriation requires that the defendant "acquired, disclosed, or used the plaintiff's trade secret through improper means," and "independent derivation . . . [is not] considered improper means," then a finding of independent derivation knocks out a crucial component of a necessary element of misappropriation. *See* Cal. Civ. Code § 3426.1; *Sargent*, 110 Cal. App. 4th at 1665. Masimo's contention that independent derivation "is relevant only to whether a trade secret was acquired through improper means" is not supported by the statutory language of CUTSA or *Sargent*. (*See* Appellant Brief at 39-40).

The Court finds that the Bankruptcy Court did not commit legal error in its analysis of "use" under CUTSA.

## C. The Bankruptcy Court's Findings That Information Was Either Not A Trade Secret Or Not Used By Sotera

For its third issue on appeal, Masimo argues that the Bankruptcy Court erred in its factual findings that the following information either was not a trade secret or not used by Sotera: (1) "custom alarm analytics" (2) "four breaths per minute" (3) "5 GHz" and (4) "installation forms." The Court addresses each in turn, under a clear error standard.

### 1. Custom Alarm Analytics

The first alleged trade secret at issue is "custom alarm analytics," which is the marketing strategy of applying a particular methodological analysis to an individual hospital's data in order to convince that hospital to adopt a program of new alarm thresholds and delays. (ER 156-57). The Bankruptcy Court found that "custom alarm analytics" was not a trade secret and that Sotera did not improperly misappropriate the concept. (ER 164).

First, the Bankruptcy Court rejected the categorization of "custom alarm analytics" as a "technical product trade secret." (ER 156). The particular methodological analysis that Masimo used to analyze hospital data was retrospective analysis. (ER 159). Masimo applied retrospective analysis to data aggregated from multiple hospitals and published the results in the industry journal *Horizons*. (ER 157). In finding that the process of gathering hospital data and applying retrospective analysis was not a trade secret, the Bankruptcy Court credited the testimony of Masimo's expert witness, Bilal Muhsin, who admitted that the *Horizons* article "explain[ed] the 'how' sufficiently for replication." (ER 161). Further, the Bankruptcy Court found that Sotera, through its engineer Scottie McCombie, created its own algorithm to conduct retrospective analysis. (ER 160). The Bankruptcy Court found McCombie's testimony to be "highly credible" and corroborated by testimony from James Welch. (ER 161). Masimo does not appear to dispute that the technical elements of "custom alarm analytics" are not trade

secrets. Instead, Masimo focuses on "custom alarm analytics" as a sales technique.

The Bankruptcy Court, in addressing "custom alarm analytics" as a sales technique, required Masimo to "show that applying the analytical method to a single hospital's data, rather than an aggregation of data from multiple hospitals, and then presenting the results to that hospital [was] a trade secret." *Id.* The Bankruptcy Court's rejection of "custom alarm analytics" as a trade secret was not due to a per se rule that sales techniques could not be trade secrets, but rather because "Masimo did not meet its burden" to demonstrate that this particular sales technique was a trade secret. *Id.* The Bankruptcy Court highlighted the deficiency of the testimony from Muhsin, Masimo's expert witness, explaining that

> Mr. Muhsin did not fare well on cross examination. In particular, he steadfastly but with obvious discomfort, held to the opinion that analyzing data from a single site in a particular manner is a protected trade secret while analyzing data from multiple sites, in the same manner, something Masimo allowed to be discussed in a paper produced by Mr. Welch, was not a trade secret. He admitted that analyzing and presenting data from five hospitals was not a secret; nor from three; nor from two. But just one was. There was no follow up on this testimony on redirect, and the Court, frankly, found the testimony nonsensical. The mere statement that something is a trade secret falls far short of what the Court needs to find that Masimo has met its burden of proof on this point. (ER 161-62).

The Court agrees. Because Muhsin's testimony conceded that the sales technique of using a particular mode of analysis on data from two or more hospitals was not a trade secret, it was not clearly erroneous for the Bankruptcy Court to be unpersuaded by Masimo's attempt to make a meaningful distinction between using the same mode of analysis on data from only one hospital. (*See* ER 1065-69).

Further, the Bankruptcy Court made an affirmative finding that "Sotera did not improperly misappropriate the concept because it was readily

10

17-cv-0885-BTM-BLM

ascertainable." (ER 164-65). The Bankruptcy Court explained that the testimony of Masimo's Joe Kiani, Paul Jansen, and Bilal Muhsin demonstrated that individual hospitals have a perception that they have unique issues or circumstances, and therefore, customized analytics would have been the only way to effectively persuade them to change their alarm management systems. (ER 163-64). In support of its "readily ascertainable" finding, the Bankruptcy Court concluded that "anyone selling to these hospitals would be told the same thing." (ER 164).

In addition, to the extent that Masimo argues that the Bankruptcy Court legally erred in including a "readily ascertainable" factor into the definition of trade secret, that error did not effect the analysis of "customized alarm analytics."[4] The Bankruptcy Court treated "readily ascertainable" as a defense to misappropriation, and did not put any burden on Masimo to prove that "customized alarm analytics" was not readily ascertainable to establish it as a trade secret. *See DVD Copy Control Ass'n*, 31 Cal. 4th at 899 ("the assertion that a matter is readily ascertainable by proper means remains available as a defense to a claim of misappropriation").

The Bankruptcy Court's finding that "custom alarm analytics" was not a trade secret and not misappropriated by Sotera was "plausible in light of the record viewed in its entirety." *See Anderson*, 470 U.S. 564 at 574. The Court cannot conclude "upon a definite and firm conviction" that the Bankruptcy Court made a mistake. *See Sepulveda*, 878 F.2d at 1139.

---

[4] Masimo points to one instance of the Bankruptcy Court using the term "reasonably ascertainable" rather than "readily ascertainable." (ER 163). Five paragraphs later, the Bankruptcy Court properly uses the term "readily ascertainable." (ER 164). Taken in the proper context, the stray usage of one imprecise term is not a material error.

## 2. Four Breaths Per Minute Limit

The second alleged trade secret at issue is "four breaths per minute," which is the idea of reducing an alarm threshold to four breaths per minute as part of an alarm management strategy. (ER 138). While the Bankruptcy Court articulated skepticism that "four breaths per minute" qualified as a trade secret, it never made such an affirmative finding. (ER 139). Instead, the Bankruptcy Court found that, regardless of the trade secret status of "four breaths per minute," there was no misappropriation because Sotera independently determined to use four breaths per minute as the lower limit in its alarm management strategy. *Id.*

The Bankruptcy Court found the evidence of Sotera's independent derivation of "four breaths per minute" both "compelling" and "overwhelming." (ER 140-41). The Bankruptcy Court credited the testimony of Tom Watlington, who explained that Sotera analyzed 694 hours of patient data from "real live hospitals" to determine the incidence of rate alarms. (ER 140; SER 754). This analysis was the basis for Sotera's decision to use four breaths per minute as a lower limit. *Id.* The Bankruptcy Court also credited the testimony of Jim Moon, who had experience with setting respiratory alarm thresholds and generally understood the clinical significance of lower respiratory limits. *Id.* Moon participated in the discussion at Sotera analyzing the data and setting the lower limit. *Id.* He testified that during these discussions, Welch never disclosed information about Masimo's respiratory rates. *Id.* The Bankruptcy Court found his testimony to be "highly credible" and "believe[d] him." *Id.* Moon's testimony that Welch never disclosed Masimo's information during discussions was corroborated by the testimony of McCombie, who the Bankruptcy Court also described as "very credible." (*See* ER 140, 1775, 1852-53).

The Bankruptcy Court weighed this evidence against the testimony from Masimo's Harold Walbrink, who concluded that Sotera must have used Masimo's trade secret because: (1) Sotera lowered its respiratory limit to four breaths per

minute after the arrival of Welch; (2) Sotera did not have a medical advisor at the time it made the change; and (3) Welch and Hunt had downloaded Masimo documents related to this topic. (ER 139-40). The Bankruptcy Court validly found Walbrink's testimony to be a mere "facial analysis" that no more than "infer[ed] that Sotera relied on Masimo trade secrets." (ER 140).

The Bankruptcy Court also considered an internal Sotera email between Don Bernstein and Welch, in which Bernstein wrote "do whatever else is necessary to literally mimic Masimo's M1A1 Abram's Tank." (ER 4550). The Bankruptcy Court concluded that "this evidence was not compelling," rejecting Masimo's characterization of the email as a directive from Sotera to use Masimo's trade secret. (ER 140). The Bankruptcy Court validly found that the email, in its proper context, was better characterized as "an exchange between a clinician providing Sotera input about Sotera's default setting." *Id.*

Masimo only identifies one piece of evidence on the record that the Bankruptcy Court did not explicity mention in its written order: a June 4, 2014 email, sent to six other Sotera employees, in which Welch explains that "short duration breath rates of 4-6 BPM are not harmful in the immediate sense." (ER 4605; Appellant Brief at 52). However, the email, sent approximately one year after Sotera had already initiated its independent study on alarm thresholds and delays, does not definitively preclude Sotera's independent derivation narrative.

The Bankruptcy Court's finding that Sotera independently derived the idea to use four breaths per minute as a lower limit in its alarm management strategy was "plausible in light of the record viewed in its entirety." *See Anderson*, 470 U.S. 564 at 574. The Court cannot conclude "upon a definite and firm conviction" that the Bankruptcy Court made a mistake in finding that there was no misappropriation by Sotera of "four breaths per minute." *See Sepulveda*, 878 F.2d at 1139.

### 3. Moving to a 5 GHz wireless frequency

The third alleged trade secret at issue is "5 GHz," which is the idea of moving from a 2.4 GHz wireless frequency to a 5 GHz one, for transmittal of patient data to a central monitoring station. (ER 154). Despite articulating some skepticism, the Bankruptcy Court assumed that "5 GHz" was a trade secret. *Id.* However, the Bankruptcy Court found, based on "overwhelming" and "credible" evidence, that there was no misappropriation because Sotera independently derived the idea. (ER 155).

The Bankruptcy Court identified compelling evidence that Sotera had already begun moving towards a 5 GHz wireless frequency before Welch joined Sotera from Masimo in 2011. The Bankruptcy Court credited the testimony of Gary Manning, who explained that Sotera began seeking hospitals' "expert opinions" on the requirement for a wireless monitoring system in 2008. *Id.* Moon also testified that Wi-Fi was identified as a critical need for Sotera's ViSi device as far back as 2009. *Id.* At the time however, the technology did not yet exist for a wireless chip that was both small enough to fit Sotera's ViSi device and able to support a 5 GHz wireless frequency. *Id.* However, by 2011, Sotera had identified a manufacturer of a promising wireless chip that had potential to meet both Sotera's size and wireless frequency goals. *Id.* The Bankruptcy Court credited a July 6, 2011 email, written two months before Welch's arrival at Sotera, between Moon and the wireless chip manufacturer, referencing the need to get to dual band, 2.4 and 5 GHz, as quickly as possible. (ER 155, 4610).

The Bankruptcy Court weighed this evidence against the following evidence from Masimo, which the Bankruptcy Court validly did not find compelling: (1) a declaration from Masimo's expert, Walbrink, who concluded that Sotera began working towards a 5 GHz solution only after Welch joined Sotera. He pointed to an August 2011 product roadmap that listed 2.4 GHz as a "must have" and then, a month after Welch joined Sotera, an October 2011 roadmap that listed 2.4 and 5

GHz as a strategic area for discussion; and (2) an October 5, 2012 email from Welch stating that the move to 5 GHz must be prioritized. The Bankruptcy Court explained that "this statement of opinion in no way establishes that Mr. Welch and a Masimo trade secret caused Sotera to desire, specify, and finally incorporate dual band radio capacity into ViSi. The overwhelming and credible evidence supports that Sotera did not rely on Mr. Welch or a Masimo trade secret in this regard." (ER 154-55, 4535).

The Bankruptcy Court's finding that Sotera independently derived the idea to move to a 5 GHz wireless frequency was "plausible in light of the record viewed in its entirety." *See Anderson*, 470 U.S. 564 at 574. The Court cannot conclude "upon a definite and firm conviction" that the Bankruptcy Court made a mistake in finding that there was no misappropriation by Sotera of "5 GHz." *See Sepulveda*, 878 F.2d at 1139.

//
//

### 4. Installation Forms

The fourth alleged trade secret at issue is "installation forms," which are questionnaire forms that Masimo developed and sent to hospitals to collect information about hospitals' network infrastructure. (ER 149-50). The Bankruptcy Court accepted that the "installation forms" were trade secrets. (ER 150-51). However the Bankruptcy Court determined that there was no misappropriation because Sotera had not "used" the "installation forms." (ER 151).

There is no dispute that Hunt emailed the "installation forms" to Sotera employees. In the email, Hunt wrote

> I have attached some IT forms from my days at Masimo. The 1965 was a requirement during either the late stages of the sales process (preferably) or right after getting the PO. The other one was for our requirement to have VPN access. Hope these help.

Gunnar Trommer, a Sotera employee, replied, copying another employee, Adam

Vasquez:

> Thank you for sharing. Adam, you might want to touch base with Dave and compare notes what you have in our RAQ and what Dave provided in these docs. There certainly is a "best practice" learning opportunity here…

(ER 149-50).

The Bankruptcy Court credited the testimony of Vasquez, who stated that while he briefly reviewed the Masimo forms, he did not use them in any way to create or modify Sotera's own forms. The Court found Vasquez's testimony to be highly credible and supported by documentary evidence. (ER 151). Vasquez testified that he had been employed as a wireless network engineer since 2005 or 2006. *Id.* In 2011, he was hired by Sotera to develop processes and procedures to install Sotera's ViSi system on hospital networks. *Id.* At the time, Sotera already had documentation in place related to future implementation of ViSi at hospitals. *Id.* This documentation included a form, the Remote Assessment Questionnaire ("RAQ"), designed to collect information about a hospital's wireless network. *Id.* Vasquez was in charge of making updates to the RAQ. (ER 152).

Vasquez compared versions of Sotera's RAQ before and after Hunt's email of Masimo's "installation forms." *Id.* The comparison revealed "several minor wording and ordering differences." *Id.* The Bankruptcy Court validly concluded that any changes between the versions of Sotera's RAQ were not material. *Id.* Vasquez further testified that in making any changes to the RAQ, he relied solely on his own experience and did not rely on any other company's form. *Id.* While Vasquez saw Masimo's "installation forms" sent from Hunt, he did not discuss the forms with Hunt. (ER 153). Additionally, Vasquez did not print out the forms and did not review them for more than a minute or two. *Id.*

The Bankruptcy Court weighed this evidence against the testimony of Masimo's expert witness, Walbrink, who concluded that "Sotera's forms implement[ed] many of the features from Masimo's forms." (ER 153, 3639-40). The

Bankruptcy Court found Walbrink's conclusion to be suspect because he compared Masimo's forms, which were designed to solicit information from hospitals before installation, to forms that Sotera used during and after installation of their system. (ER 153). The Bankruptcy Court found Walbrink's testimony to be an "apples versus elephants analysis" that relied on a "comparison [that was] meaningless in terms of hospital questionnaire form development." *Id.* When the Bankruptcy Court identified Sotera questionnaires that were a more appropriate comparison to Masimo's forms, it found mere "cosmetic changes" between the versions before and after Hunt's email. *Id.*

Masimo argues that the Bankruptcy Court legally erred in its finding that Sotera did not "use" Masimo's "installation forms" because nothing more than "passive consideration" is required to establish "use" under CUTSA. (Appellant Brief at 57). As previously discussed, Masimo's allegation of legal error is without merit and relies on an assertion of a rule derived from an overbroad reading of *Syngenta* that is divorced from its essential factual context. *See Syngenta*, 138 Cal. App. 4th at 1172-73. CUTSA "does not define the term 'use'" and "the meaning of the term may vary depending on the context." *See id.* at 1172. The Bankruptcy Court validly found, that in this particular context, Vasquez's one to two minute consideration of Masimo's "installation forms," accompanied by no further action, did not constitute "use." *See 02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005) ("use does not mean mere possession of a trade secret or mere internal discussion within the company of a trade secret").

The Bankruptcy Court's finding that Sotera did not "use" Masimo's "installation forms," when Vasquez briefly reviewed the forms for a minute or two, was "plausible in light of the record viewed in its entirety." *See Anderson*, 470 U.S. 564 at 574. The Court cannot conclude "upon a definite and firm conviction" that the Bankruptcy Court made a mistake in finding that there was no misappropriation by Sotera of the "installation forms." *See Sepulveda*, 878 F.2d at 1139.

### D. Masimo's Request For Royalties

For its final issue on appeal, Masimo argues that the Bankruptcy Court failed to address Masimo's request for a royalty for Sotera's supposed misappropriation of thousands of Masimo documents. Masimo requests a remand in order for the Bankruptcy Court to consider Masimo's request and decide whether royalties are appropriate. (Appellant Brief at 58). However, Masimo's argument is premised on a misreading of the Bankruptcy Court's order.

"[I]f neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited." Cal. Civ. Code § 3426.3(b). A consideration of a royalty award is only triggered upon a finding of misappropriation.

The Bankruptcy Court found that Welch copied more than 4,500 Masimo files and that Hunt copied approximately 2,500 Masimo files. (ER 115, 118). With respect to Welch, the Bankruptcy Court determined that when he "transferred Masimo files to his Sotera computer and when he opened any of them Sotera acquired Masimo trade secrets and, therefore, misappropriated Masimo trade secrets within the meaning of the CUTSA." (ER 116). With respect to Hunt, the Bankruptcy Court determined that when he "transferred Masimo files to a Sotera computer or flash drive and when he opened any of them Sotera acquired Masimo trade secrets and, therefore, misappropriated Masimo trade secrets within the meaning of the CUTSA." (ER 119). The Bankruptcy Court's misappropriation finding did not apply to all of the thousands of Masimo files copied, rather, it applied only to the files opened by Welch and Hunt. The Bankruptcy Court noted that "the universe of opened documents [was] small." (ER 116). The Bankruptcy Court acknowledged that there was no dispute that Welch opened 5 Masimo documents and that Hunt opened 6 Masimo documents. (ER 115-16, 118-19). In total, the Bankruptcy Court awarded damages of $540,000 for Sotera's misappropriation of

Masimo's pricing and customer trade secrets. (ER 186, 189).

Because the Bankruptcy Court found no misappropriation for the remaining thousands of Masimo documents copied but not accessed or opened, the Bankruptcy Court did not err by not considering a royalty award.

**E. Equitable Mootness**

While the Court addresses the merits of Masimo's appeal, Sotera argues that the Court should dismiss the appeal under the doctrine of equitable mootness because the Bankruptcy Court confirmed Sotera's reorganization plan on May 12, 2017 (ER 4279 ("Confirmation Order")) and Masimo did not object to certain provisions of the Confirmation Order and did not appeal the Confirmation Order. (ECF 37 at 57-58).

"Equitable mootness is a prudential doctrine by which a court elects not to reach the merits of a bankruptcy appeal. An appeal is equitably moot if the case presents transactions that are so complex or difficult to unwind that debtors, creditors, and third parties are entitled to rely on the final bankruptcy court order." *In re Transwest Resort Properties, Inc.*, 801 F.3d 1161, 1167 (9th Cir. 2015) (internal citation and quotations omitted). To determine whether an appeal is equitably moot, courts look at: (1) "whether a stay was sought, for absent that a party has not fully pursued its rights", (2) "if a stay was sought and not gained, . . . whether substantial consummation of the plan has occurred", (3) "the effect a remedy may have on third parties not before the court", and (4) "whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court." *In re Thorpe Insulation Co.*, 677 F.3d 869, 881 (9th Cir. 2012).

As to the first factor, Masimo filed an emergency motion for a stay pending possible appeal of the confirmation order, which the Bankruptcy Court denied. (SER 292). As to the second factor, substantial consummation has occurred as

the effective date of Sotera's reorganization plan was May 22, 2017. (SER 285). As to the third factor, Sotera makes no mention of the effect a remedy may have on third parties not before the Court. (*See* ECF No. 37 at 60). As to the fourth factor, the Bankruptcy Court originally awarded Masimo a claim of $558,000. (ER 191). However, Sotera's reorganization plan permits Masimo's relief to draw from the $3,325,000 set aside for the Class 6 Pool. (SER 1311). Accordingly, upon remand, the Bankruptcy Court would be able to award more than the original amount of $558,000 without serious disruption to the plan. Therefore, the Court can fashion "effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation." *See In re Thorpe Insulation Co.*, 677 F.3d at 881.

Because the factors do not weigh in favor of applying equitable mootness, the Court declines to dismiss Masimo's appeal on this basis.

## IV. CONCLUSION AND ORDER

For the foregoing reasons, the Court AFFIRMS the order of the Bankruptcy Court. The clerk shall enter judgment accordingly.

IT IS SO ORDERED.

Dated: September 11, 2018

*[signature]*
Barry Ted Moskowitz, Chief Judge
United States District Court